Sara Jean MARKOVICH, et al.

v.

BELL HELICOPTER TEXTRON, INC. and Textron, Inc.

Civ. A. No. 90–3828.

United States District Court, E.D. Pennsylvania.

April 6, 1992.

Arthur Alan Wolk, James D. Golkow, Richard E. Genter, Wolk, Genter & Harrington, Philadelphia, Pa., for plaintiffs.

Brian L. Lincicome, Patrick J. O'Connor, Cozen & O'Connor, Ann T. Field, Philadelphia, Pa., for defendants.

## OPINION

CAHN, District Judge.

On June 17, 1988, Anthony Markovich and Mark Tarmann were flying a Bell Model 206L helicopter (as the pilot and co-pilot respectively) over Springfield Township, Bucks County, Pennsylvania. The helicopter crashed, killing them both. The helicopter was owned by William H. Thayer, and had been leased to Fleet Helicopter Services ["Fleet"],[1] a corporation controlled by Mr. Thayer. It had been manufactured by the defendants, Bell Helicopter Textron, Inc. and Textron Inc., eight years previously.

This suit was brought by the families of the decedents, in their personal and representative capacities against the helicopter's manufacturers. Although the primary thrust of plaintiffs' case was that the helicopter was defective within the meaning of Section 402A of the *Restatement (Second) of Torts,*[2] they also argued that the helicop-

1. Based on other cases before the court, the court is under the impression that Fleet has filed for bankruptcy.

2. Specifically, the plaintiffs alleged that the bolt which connected the idler lever to the idler link failed because of hydrogen embrittlement. Although the defendants agreed that the crash was caused by the separation of the idler lever and the idler link while the helicopter was in flight, they disagreed as to the cause of the separation. Since the bolt which connected the two parts was never recovered, the reason for the separation was hotly contested at trial.

Hydrogen embrittlement is a condition which can result when a metal part (such as a bolt) is electroplated to prevent corrosion. In order to electroplate a bolt, the bolt is placed in a "bath" of the plating agent (in this case cadmium) dissolved in water. An electrical current is then applied, causing the dissolved cadmium to adhere to the surface of the bolt. Running an electrical current through a water solution, however, causes some of the water molecules to separate into molecules of oxygen and hydrogen. Some of the hydrogen molecules become trapped beneath the cadmium plating, within

ter was negligently manufactured, and that the defendants negligently supervised Fleet's maintenance program.

This case was tried to a jury from November 25, 1991 until December 6, 1991. By its answers to interrogatories, the jury found that the bolt in question was not defective due to hydrogen embrittlement. Because the jury answered no to question number one, it never reached the remaining questions (dealing with whether the bolt, if found to be defective, was a substantial factor in causing the crash, and with damages). The plaintiffs' post-trial Motion for Judgment As a Matter of Law, or, in the Alternative, for a New Trial, is now before the court. The court heard oral argument on this Motion on January 27, 1992.

Although the plaintiffs' Memorandum in support of their post-trial Motion enumerates twenty perceived shortcomings of the trial, the plaintiff's grounds for requesting post-trial relief are essentially fourfold: (1) that the court erred in dismissing the plaintiff's negligence claims; (2) that the court erred in allowing the defendants to introduce evidence of industry standards; (3) that the court erred in embracing the testimony of the defendants' expert witnesses during its charge; and (4) that the defendants engaged in fraud in the discovery process. These claims will be addressed *seriatim.*

## I. STANDARDS FOR POST–TRIAL MOTIONS

The plaintiffs have moved both for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(b)[3] and for a new trial pursuant to Fed.R.Civ.P. 59(a).

the bolt itself. Over time, these trapped hydrogen molecules migrate to "spaces" within the atomic latticework of the bolt. The "pressure" exerted by the trapped hydrogen molecules on the atomic structure of the bolt can cause the bolt to become brittle, and therefore to fail during use.

In order to "drive the hydrogen out" of electroplated parts, the parts are baked. At trial, the plaintiffs contended that the relevant bolt was defective because it had been baked for three, rather than for twenty-three, hours. By its verdict, the jury rejected this argument.

■ A court cannot enter judgment as a matter of law unless the party seeking the judgment made a Rule 50(a) Motion at the close of all the evidence at trial. *See Keith v. Truck Stops Corp. of America,* 909 F.2d 743, 744 (3d Cir.1990); *Mallick v. International Brotherhood of Electrical Workers,* 644 F.2d 228, 233 (3d Cir.1981); Fed. R.Civ.P. 50(b).

> The specific grounds for [judgment as a matter of law] must be asserted in the motion for a directed verdict. If the issue was not raised in the motion for the directed verdict at the close of *all* the evidence, it is improper to grant the [motion] on that issue. The requirement that the specific issue be raised first in the motion for a directed verdict, before the issue is submitted to the jury, affords the non-moving party an opportunity to reopen its case and present additional evidence. Further, when a trial court decides an issue after it was properly submitted to the jury, it may deprive the non-moving party of [its] seventh amendment rights.

*Bonjorno v. Kaiser Aluminum and Chemical Corp.,* 752 F.2d 802, 814 (3d Cir. 1984), cert. denied, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) (emphasis supplied) (citations omitted). Since the plaintiffs made such a Motion at the close of all the evidence, *see* N.T. Dec. 6 at 5,[4] the court will consider the merits of their Motion.

■ In deciding whether a Rule 50(b) motion should be granted, "[a] court must view the evidence in the light most favorable to the non-moving party, and determine whether 'the record contains the "minimum quantum of evidence from which a jury might reasonably afford re-

3. Fed.R.Civ.P. 50 has recently been amended. The Rule no longer provides for the entry of a "J.N.O.V.", rather, it now provides for the entry of "judgment as a matter of law." This change in the language of Rule 50 has not changed the standards for granting a Motion made pursuant to the Rule. *See* Fed.R.Civ.P. 50 Advisory Committee Notes (1991).

4. Citations to the Record are in the form N.T. (date) at (page).

lief." ' " *Keith,* 909 F.2d at 745 (citation omitted). *See also Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir. 1990); *Bhaya v. Westinghouse Electric Corp.,* 832 F.2d 258, 259 (3d Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *Grace v. Mauser–Werke GmbH,* 700 F.Supp. 1383, 1387 (E.D.Pa.1988). It is for this reason that "[n]ormally, when the evidence is contradictory, [judgment as a matter of law] is inappropriate." *Bonjorno,* 752 F.2d at 811 (citation omitted). The jury must weigh the evidence, if the evidence is in dispute, because "[e]valuation of witness credibility is the exclusive function of the jury." *Bhaya,* 832 F.2d at 262. *See also Bonjorno,* 752 F.2d at 811; *Grace,* 700 F.Supp. at 1387.

The conditions which must be met to justify the grant of a new trial are not as stringent as those required for the entry of judgment as a matter of law. "In general, the ordering of a new trial is committed to the sound discretion of the district court." *Bonjorno,* 752 F.2d at 812. *See also Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1348 (3d Cir.1991); *Honeywell v. American Standards Testing Bureau, Inc.,* 851 F.2d 652, 655 (3d Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989); *Feingold v. Raymark Industries, Inc.,* 1988 Westlaw 76114 at *3 (E.D.Pa. July 19, 1988); *Grace,* 700 F.Supp. at 1387. A new trial cannot be granted, however, merely because the court would have weighed the evidence differently and reached a different conclusion. *See Feingold,* 1988 Westlaw 76114 at *3; *Grace,* 700 F.Supp. at 1387. A court can only exercise its discretion to grant a new trial because the verdict was against the weight of the evidence when the failure to do so would result in injustice, or would shock the conscience of the court. *See Williamson,* 926 F.2d at 1352–53; *Feingold,* 1988 Westlaw 76114 at *3; *Grace,* 700 F.Supp. at 1388.

Since the standard for granting a new trial is "lower" than that for entering judgment as a matter of law, it is clear that if a new trial is not warranted, the entry of judgment as a matter of law would be improper. For this reason, the court will analyze the plaintiffs arguments under the new trial standard. Since the court finds that a new trial is not warranted, the court will also decline to enter judgment as a matter of law.

## II. NEGLIGENCE CLAIMS

At trial, the plaintiffs based their case on Section 402A. All of the facts and arguments they introduced were designed to lead the jury to conclude that the bolt in question was defective within the meaning of Section 402A. Their attempts, at the post-trial stage, to change the basis of their case are ultimately futile. At trial, the court ruled that there was insufficient evidence for the jury to consider any negligence claims.[5] The plaintiffs now claim

---

5. It appears that the plaintiffs object to the court's failure to submit two separate negligence claims to the jury. The plaintiffs' first claim is that the jury should have been allowed to consider whether the defendants were negligent in giving Fleet advice on repairing the helicopter following a "hard landing/sudden stoppage" which occurred on March 29, 1988. The reasons for the court's refusal to submit this claim to the jury will be discussed. *infra* at 1236–1237. It should be noted that it was the plaintiffs trial strategy to focus mainly on the Section 402A claim. In doing so, the plaintiffs introduced evidence that the "hard landing" was so mild that an FAA inspector, on board the aircraft at the time, felt practically no impact. The plaintiffs' purpose was to negate the possible defense that the bolt did not fail due to hydrogen embrittlement, but instead failed because it had been weakened in the "hard landing."

The plaintiffs' second argument is that the court should have instructed the jury that, in addition to finding the bolt defective within the meaning of Section 402A, it could find that the defendants had negligently manufactured the bolt. The court refused to submit this claim to the jury, holding that it was subsumed by the plaintiffs' 402A claims. Even if this ruling was not correct, and the court is convinced that it was, no harm resulted. The jury found that the bolt was not defective because of hydrogen embrittlement. The court is at a loss to understand how the jury, having rejected a strict liability claim, could then find in favor of a negligence claim involving the same product. *See Huddell v. Levin,* 537 F.2d 726, 734 (3d Cir.1976) (discussing the advantages to the plaintiff of proceeding under a strict liability claim); *Cipriani v. Sun Pipe Line Co.,* 393 Pa.Super. 471, 574 A.2d 706, 711, *appeal denied,* 527 Pa. 661,

that the court's ruling was erroneous. Specifically, the plaintiffs claim that the jury should have been allowed to consider whether the defendants were negligent in either giving advice to Fleet following the "hard landing/sudden stoppage" of March 29, 1988, or in failing to "de-certify" Fleet as a Bell customer service facility. The court rejects these contentions.

■■■■ It is clear that the mere occurrence of an injury does not give rise to an inference that one of the parties involved was negligent. *See Hicks v. Unger Motor Co.*, 332 F.Supp. 118, 121 (E.D.Pa.1971); *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1284 (1978); *Bohner v. Eastern Express, Inc.*, 405 Pa. 463, 175 A.2d 864, 867 (1961). In order to prevail on a negligence claim under Pennsylvania law,[6] the plaintiff must prove the following elements: (1) a duty, recognized by the law, of the defendant to conform its conduct to a standard of care; (2) a breach of that standard of care; (3) a causal connection between the breach and the (4) injury to the plaintiff. *See Zimmer Paper Products, Inc. v. Berger & Montague*, 758 F.2d 86, 93–94 (3d Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985); *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680, 684 n. 5 (1983); *Caldwell v. Commonwealth of Pennsylvania*, 120 Pa. Cmwlth. 358, 548 A.2d 1284, 1286 (1988); *Zanine v. Gallagher*, 345 Pa.Super. 119, 497 A.2d 1332, 1334 (1985). "[I]t is the duty of the trial judge to determine, prior to sending the case to the jury, whether or not the plaintiff has met this burden."

*Morena*, 462 A.2d at 683. The court's ruling in regard to the negligence claims was correct because the plaintiffs failed to submit evidence demonstrating a duty on the part of the defendants, or sufficient evidence for the jury to find that any negligence on the part of the defendants proximately caused the helicopter to crash.[7]

*A. Duty*

■■■■ Under Pennsylvania law, the existence of a duty is predicated on the relationship between the plaintiff and the defendant. *See Morena*, 462 A.2d at 684; *Zanine*, 497 A.2d at 1334. "In negligence, the preliminary determination of whether a duty exists with respect to the particular claimant is for the court." *Huddell v. Levin*, 537 F.2d 726, 734 (3d Cir.1976). This determination is critical since Pennsylvania "courts have emphasized that there can be no negligence where there is no duty of care." *Zanine*, 497 A.2d at 1334.

■■■■ At trial, the court questioned plaintiffs' counsel as to whether the customer service facility agreement between Fleet and the defendants created any duty which ran from the defendants to parties other than Fleet. Plaintiffs' counsel cited *Toole v. United States*, 588 F.2d 403 (3d Cir.1978) for the proposition that a party which enters into an agreement with a subcontractor has a duty to the subcontractor's employees to either supervise the subcontractor in such a way as to keep its employees from harm or to warn the subcontractor's employees directly of the dangers they face. *See Toole*, 588 F.2d at 406. Because

---

593 A.2d 837 (1990) (holding that, in a case where the trial judge instructed the jury that a professional defendant should be held to an ordinary standard of care, and where, despite this error, the jury found for the plaintiff, the defendant was not entitled to a new trial since the jury would certainly have found for the plaintiff if they had been instructed to hold the defendant to the correct (higher) standard of care). Harmless error is not grounds for the grant of a new trial. *See* Fed.R.Civ.P. 61.

**6.** Pennsylvania law is controlling in this diversity action.

**7.** In their brief, plaintiffs suggest that, in addition to erring in refusing to allow negligence

issues to go to the jury, the court erred in allowing certain negligence concepts to remain in a strict liability case. From this argument it appears that the plaintiffs wish to have it both ways: they wish to argue that the court erred in admitting too much evidence of negligence, and also that it erred in not recognizing how much evidence of negligence was properly admitted. Without passing on the merits of such seemingly contradictory arguments, the court notes that "even in a strict liability case, causation must be shown." *Lapenna v. Upjohn Co.*, 665 F.Supp. 412, 414 (E.D.Pa.1987). Much of the so-called evidence of negligence which the plaintiffs find, in hindsight, to be objectionable, was properly admitted as going to the issue of what caused the helicopter to crash.

of *Toole*, the plaintiffs reason, the defendants were under a duty to supervise Fleet in such a way as to keep Fleet's employees (such as Markovich and Tarmann) from harm. Since Markovich and Tarmann were harmed, the plaintiffs believe that a jury should decide if the defendants breached their duty to protect Markovich and Tarmann.

The flaw in the plaintiffs' argument is that the facts of *Toole* are clearly distinguishable from the facts of the case at bar. *Toole* involved a contract between the United States Government and the manufacturer of the "fuze rocket," an antitank weapon produced for the United States Army. *See Toole*, 588 F.2d at 404. The contract in question provided that, if a department of defense inspector[8] determined that the manufacturer was not in compliance with the contract, the government could terminate the contract. *See Toole*, 588 F.2d at 405. Given the restrictions on, and the limited market for, the product involved (an antitank rocket), termination of the government contract would have effectively shut down the manufacturer's production line.

The plaintiff in *Toole* worked on the assembly line which produced the fuze rocket. Specifically, the plaintiff's job was to stake the primer and detonator of the rocket. This process was accomplished by placing a primer inside a detonator, and then placing the assembled product into a machine which crimped the two together. *See Toole*, 588 F.2d at 404. Since both the primer and the detonator of the fuze rocket were composed of high explosives, and since 50 detonators and 350 primers were present at the work station where the staking was performed, there was an extreme danger of an explosion occurring during the process. *See Toole*, 588 F.2d at 404. For this reason, the contract explicitly provided for a safety shield of a certain strength. *See Toole*, 588 F.2d at 405. When the plaintiff in *Toole* was killed in an explosion, the Third Circuit Court of Appeals ruled that the United States was under a duty to require the manufacturer to utilize the proscribed protective shield. *See Toole*, 588 F.2d at 408–09.

These facts differ markedly from those of the case at bar. The case at bar does not involve the Federal Government (an entity which owes the public at large substantially more duties than private actors); instead, it involves private parties. Further, while the government could have shut down the manufacturer in *Toole*, the defendants in this case had no such power over Fleet. They could only suggest that Fleet take certain actions. The most severe sanction which the defendants could impose on Fleet for non-compliance would be the termination of the customer service facility agreement. Termination of the agreement would not have prevented Fleet from acting as it pleased; it would only have prevented Fleet from purchasing parts from the defendants at a customer service facility discount. *See* N.T. Dec. 3 at 165–66; 215.

■ Finally, the case at bar does not involve explosives or other ultrahazardous activities.[9] Operations involving explosives have always been accorded special treatment by the law of torts. *See, e.g.,* William Prosser and W. Page Keeton, *The Law of Torts* 552–54 (1984); *Restatement (Second) of Torts*, § 520 comment i; *Restatement (Second) of Torts*, § 520 comment j. It is not surprising, therefore, that the Third Circuit Court of Appeals imposed a duty on the United States Government to warn or protect those manufacturing munitions at its behest. This court will not, based on this precedent, impose a duty on all actors to supervise their subcontractors or be liable to the subcontractors' employees. Instead, the court will read *Toole* to its facts; imposing a duty on the Federal Government to supervise munitions manufactur-

---

**8.** The contract mandated quarterly inspections of the manufacturer's facilities. *See Toole*, 588 F.2d at 405.

**9.** While the improper maintenance of a helicopter can certainly cause great hazards, the same can be said for the maintenance of automobiles, school busses, and, indeed, any other piece of machinery. This court is unwilling to extend the label of ultrahazardous activity to any activity from which death or dismemberment could result.

ers. Since the plaintiffs failed to introduce evidence from which the jury could find a duty running from the defendants to the plaintiffs, the court's decision to prevent negligence issues from reaching the jury was correct.

### B. *Causation*

■ The court's refusal to allow the jury to consider negligence issues was also grounded on the plaintiffs' failure to offer evidence that the defendants' negligence (if any) caused the accident which forms the basis for this lawsuit. If the plaintiff in a negligence case fails to proffer sufficient evidence of the causal connection between the defendant's negligence and the plaintiff's injury, a court applying Pennsylvania law is required to direct a verdict in favor of the defendant. *See Bohner*, 175 A.2d at 868; *Listino v. Union Paving Co.*, 386 Pa. 32, 124 A.2d 83, 86 (1956); *Caldwell*, 548 A.2d at 1286.

> Proof of causation involves two elements: proof of cause in fact and proximate cause. Cause in fact or "but for" causation requires proof that the harmful result would not have come about but for the conduct of the defendant. Proximate cause, in addition, requires proof that the defendant's conduct was a substantial contributing factor in bringing about the harm alleged. Where the relevant facts show either that the defendant was not responsible for the injury, or that the causal connection between the defendant's negligence and the plaintiff's injury is remote, the question of causa-

tion is decided by the court as a matter of law.

*Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366–67 (3d Cir.1990) (discussing Pennsylvania law). *See also Klingler v. Yamaha Motor Corp., U.S.A.*, 738 F.Supp. 898, 908 (E.D.Pa.1990) ("whether proximate cause exists may be decided as a matter of law where the proposed chain of causation is so attenuated, so dependent upon unprovable contingencies, that the plaintiff is not within the group of individuals properly able to reach the defendant."); *Novak v. Jeannette District Memorial Hospital*, 410 Pa.Super. 603, 600 A.2d 616, 618 (1991) (Wieand, J.) ("We are here concerned with an issue of proximate cause. This is essentially an issue of law, i.e., whether the defendant's negligence, if any, was so remote that, as a matter of law, he cannot be held legally responsible for harm which subsequently occurred.").

■ The plaintiffs failed to produce any evidence that would tend to show that, had the defendants' representatives offered Fleet different advice following the incident of March 29, 1988, the accident would not have occurred.[10] Since a jury verdict cannot be based on mere speculation,[11] *see Vlases v. Montgomery Ward & Co.*, 377 F.2d 846, 851 (3d Cir.1967); *Morena*, 462 A.2d at 683; *Novak*, 600 A.2d at 618 (refusing to allow a jury to speculate that, had a secondary driveway not been removed, an automobile accident would not have happened); *Moyer v. Ford Motor Co.*, 205 Pa.Super. 384, 209 A.2d 43, 45 (1965),[12] this failure on plaintiffs' part prevented the court from allowing the jury to consider

---

**10.** If the plaintiffs' injuries would have occurred even in the absence of the defendants' negligence, the plaintiffs cannot recover. *See Listino*, 124 A.2d at 85; *Hamil*, 392 A.2d at 1284.

**11.** Given that there was no evidence that Fleet always followed the defendants' advice in regard to maintenance, the jury could not infer that different advice would have been followed even if it had been given. The impossibility of the task the plaintiffs would set before the jury becomes even more apparent when one considers the fact that the cause of the crash was never determined. Without knowing exactly what caused the idler link to separate from the idler lever, the jury could not determine whether advice, even if followed, would have prevented the separation. For this reason, the court

finds that any jury verdict in this area would be pure speculation.

**12.** *See also Farnese v. SEPTA*, 338 Pa.Super. 130, 487 A.2d 887 (1985). *Farnese* involved a suit for personal injuries the plaintiff sustained while riding in a SEPTA bus. When the plaintiff was injured, the bus was traveling down Chestnut Street in Philadelphia. The street was under construction. The plaintiff joined the city of Philadelphia to the suit, and sought to have the jury infer that, since the bus he was riding hit some sort of a bump, the city had been negligent in carrying out its program of road construction. The court rejected this argument, finding that it was based on pure speculation. *See Farnese*, 487 A.2d at 889–90. In doing so, the court stated that "the trial court has a duty

the issue. Similarly, the plaintiffs failed to present any evidence at trial that would show that, had the defendants terminated Fleet as a customer service facility, the accident would not have occurred. Termination of the customer service facility agreement would not have grounded Fleet's helicopters, nor would it have prevented Fleet from performing maintenance on its own aircraft. Only the FAA has the power to ground aircraft. *See* N.T. Dec. 3 at 166; 215. The plaintiffs never introduced evidence showing that the defendants had a duty to report Fleet to the FAA. Furthermore, a jury finding that, had a report been made, the FAA would have grounded the helicopter would have been based on pure speculation. *Cf. Klingler*, 738 F.Supp. at 909 ("More disturbingly, this court would be obligated to decide whether a nonexistent safety rule was adequately justified by the nonexistent record not presented to the Commission. Such a prodigious feat of judicial clairvoyance is beyond the skills of this court.").[13]

## III. EVIDENCE OF INDUSTRY STANDARDS

■ Under Pennsylvania law, it is improper to allow a party to introduce evidence of "industry standards" in order to prove (or to disprove) that a product was defective within the meaning of Section 402A. *See Santiago v. Johnson Machine and Press Corp.*, 834 F.2d 84, 85 (3d Cir. 1987) (citing *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 515 Pa. 334, 528 A.2d 590 (1987)); *Holloway v. J.B. Systems, Ltd.*, 609 F.2d 1069, 1073 (3d Cir. 1979); *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 515 Pa. 334, 528 A.2d 590, 594 (1987).[14] The plaintiffs argue that the court impermissibly allowed the defendants to introduce such evidence (namely, the industry standard with regard to the length of time for baking cadmium plated bolts), and that a new trial is therefore warranted. The court rejects this argument.

■ The court does so because it was the plaintiffs who opened the door to the introduction of industry standards for baking cadmium bolts. During the plaintiffs' case-in-chief, their expert, Manuel Raefsky, testified to the industry standard for baking cadmium bolts on *direct* examination. *See* N.T. Nov. 25 at 101; 158.[15] Mr. Raefsky elaborated on his testimony as to the

to prevent questions from going to the jury which would require it to reach a verdict based on conjecture, surmise, guess or speculation." *Farnese*, 487 A.2d at 890.

13. In their Memorandum in support of their post-trial Motions, the plaintiffs rely upon *Cipriani v. Sun Pipe Line Co.*, 393 Pa.Super. 471, 574 A.2d 706, *appeal denied*, 527 Pa. 661, 593 A.2d 837 (1990) for the proposition that expert testimony is not required to establish proximate causation. The court initially notes that the plaintiffs did not introduce lay testimony on this point. Even if they had done so, *Cipriani* does not control in this situation. The *Cipriani* court found that "[w]here there is a sufficiently close relationship between the accident and the injury, the causal relationship may be established without the aid of expert testimony." *Cipriani*, 574 A.2d at 715. In this case, the causal relationship (if any) between either the advice the defendants gave to Fleet following the March 29, 1988 incident or the defendants' decision not to terminate Fleet as a customer service facility and the crash is anything but "close."

In addition, it is by no means clear that the plaintiffs could have met their burden through the use of expert testimony. While expert testimony is admissible to aid the jury in cases where the issues are beyond the knowledge and expertise of laymen, *see Hamil*, 392 A.2d at 1285, an expert cannot simply speculate. *See Advent Systems, Ltd v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir.1991); *Moyer*, 209 A.2d at 45. Expert testimony, if offered (which it was not) would probably have been speculative for the reasons given above.

14. The introduction of such evidence, however, can be harmless, and does not necessarily require a new trial. *See Holloway*, 609 F.2d at 1073; Fed.R.Civ.P. 61.

15. Specifically, Mr. Raefsky testified that

· The fact of the matter is that in the late '60's and in the early '70's, regardless of what the specifications were saying, that there was a body of feeling that a three-hour bake was not adequate to completely eliminate the potential of hydrogen embrittlement. And people were going—regardless of what the specs said, they were going to longer baking times to insure that hydrogen would be driven out.
N.T. Nov. 25 at 158. Since this testimony was given during direct examination, it is clear that the plaintiffs are the ones who opened the door on this subject.

industry standards for baking cadmium bolts during cross-examination. *See* N.T. Nov. 26 at 99–102. In fact, Mr. Raefsky specifically testified that, in 1974, Boeing was baking similar bolts in excess of three hours. *See* N.T. Nov. 26 at 101–02. Having introduced this testimony during their case-in-chief, the plaintiffs cannot preclude the defendants from offering testimony in their case-in-chief to rebut the statements made by Mr. Raefsky. *See Leaphart v. Whiting Corp.*, 387 Pa.Super. 253, 564 A.2d 165, 171, *appeal denied*, 525 Pa. 619, 577 A.2d 890 (1989) ("even if the evidence [of industry standards] was in fact inadmissible, the appellants, having introduced the evidence in their case in chief, cannot later deprive their opposition of the privilege of denying it.") (collecting cases). For this reason, granting a new trial because of the introduction of "industry standard" evidence would be improper.

## IV. THE JURY CHARGE

■■■■■ The plaintiffs claim to be entitled to a new trial because of the court's prejudicial summation of the evidence during the jury charge. It is settled law that the trial judge is allowed to comment on the evidence presented at trial. *See American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 327 (3d Cir.1985); *Kornicki v. Calmar Steamship*

*Corp.*, 460 F.2d 1134, 1137 (3d Cir.1972) (Adams, J.).[16] In order to be entitled to a new trial, the plaintiffs must demonstrate that the court's comments became so one sided as to become advocacy. *See American Home Assurance*, 753 F.2d at 327. Additionally, the plaintiffs cannot prevail by showing that one portion of the charge, standing alone, is suspect; the charge must be considered as a whole. *See Bhaya v. Westinghouse Electric Corp.*, 922 F.2d 184, 191 (3d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991).[17]

When evaluated under this standard, the plaintiffs' challenges clearly fail. The plaintiffs take exception to the court's statement that "[t]he first thing you must think about is the Eagar opinion that [hydrogen embrittlement] can't exist for more than 100 hours." N.T. Dec. 6 at 94.[18] In arguing that this statement constitutes error, the plaintiffs ignore the fact that the court instructed the jury to consider the plaintiffs' expert's opinion as well. *See* N.T. Dec. 6 at 94 ("On the other hand, you have to consider the Raefsky opinion where—and all the urgings by Mr. Wolk on this point as well as Mr. O'Connor, that the hydrogen can remain trapped in there, can be activated by some other incident and cause the bolt to fail in a delay situation.").[19] This, combined with the court's

---

**16.** Although the court is permitted to comment on the evidence, it was careful to instruct the jury that any comments the court made were not to be considered as evidence, *see* N.T. Dec. 6 at 76, and that it was the jury's collective recollection of the evidence which was controlling. *See* N.T. Dec. 6 at 77. Furthermore, the court made it clear to the jury that its comments were "superficial" rather than exclusive or exhaustive, and that all the lawyers would want the jury to consider evidence which the court declined to comment on. *See* N.T. Dec. 6 at 88–89.

**17.** The court was careful to instruct the jury that the court's charge should be taken as a whole, *see* N.T. Dec. 6 at 74, and that the charge contained no "hints" or "reverse hints." *See* N.T. Dec. 6 at 87–88.

**18.** The court made this statement while instructing the jury on interrogatory 2 (was the hydrogen embrittlement which was found to exist by virtue of a "yes" answer to interrogatory 1 a substantial factor in causing the crash). Dr.

Eagar, a defense expert, had opined that, even if the bolt had been "contaminated" with hydrogen when it was manufactured, all of the hydrogen would have naturally "evaporated" from the bolt within the first 100 hours. For this reason, Dr. Eagar opined, hydrogen introduced into the bolt during its manufacture in 1980 could not have caused the bolt to fail in 1988.

**19.** Following the jury charge, the court invited the attorneys to raise their concerns with the charge at sidebar. When the plaintiffs' attorney objected to the court's references to Dr. Eagar's testimony, the court gave the following instruction:

Mr. Wolk is quite right in suggesting that I may have referred to Dr. Eagar more than a couple times in my instructions to you to make a point. First, I don't mean to endorse his testimony by doing that. What I was trying to do was point you in the direction of the controversy and I mentioned his name only to do that. Secondly, [whenever] I said

admonition to the jury that it was free to give the expert testimony the weight it thought the testimony deserved, *see* N.T. Dec. 6 at 79–80, makes it clear that the court did not become an advocate for the defendants during the jury charge.

■ The plaintiffs also argue that the court erred in its comments regarding the damages experts by suggesting that the jury should adopt the approach used by the defendants' experts and that the plaintiffs' experts' opinions were "extreme." First, the court must note that, since the jury never reached the issue of damages because it found that the bolt in question was not defective, any error relating to the damages instructions would be harmless.

■ Second, the court does not believe that its comments were erroneous. In referring to Dr. Verzilli's opinion, the court simply stated that the jury could best consider the damage opinions as a range. *See* N.T. Dec. 6 at 99.[20] The court then went on to state what must have been intuitively obvious to the jurors; that the plaintiffs' experts' opinions represented the high end of the range and the defendants' experts' opinion represented the low end of the range. *See* N.T. Dec. 6 at 99. The court then admonished the jury that, if it reached the issue of damages, it "should not exceed the highest figure in evidence or the lowest figure in evidence. And your verdict, if you get to Question 3–B, should be somewhere in between there." N.T. Dec. 6 at 99–100. The court then reminded the jury that it was free to accept or reject the opinions given by the experts, and that the

conclusion it would reach would vary dramatically depending on which expert it chose to credit. *See* N.T. Dec. 6 at 100. It cannot be said that the court assumed the role of an advocate by making these comments.[21]

## V. FRAUD IN THE DISCOVERY PROCESS

■ Technically, the plaintiffs' Motion for a new trial because of the defendants' fraud in the discovery process is made pursuant to Fed.R.Civ.P. 60(b)(2) (dealing with the grant of a new trial based on newly discovered evidence). The Third Circuit Court of Appeals "view[s] Rule 60(b) motions as 'extraordinary relief which should be granted only where extraordinary justifying circumstances are present.' " *Bohus v. Beloff,* 950 F.2d 919, 930 (3d Cir.1991) (citations omitted). *See also Plisco v. Union Railroad Co.,* 379 F.2d 15, 16 (3d Cir.), *cert. denied,* 389 U.S. 1014, 88 S.Ct. 590, 19 L.Ed.2d 660 (1967). As is the case with a Rule 59(a) Motion for a new trial, the decision to grant a new trial pursuant to Rule 60(b)(2) is committed to the sound discretion of the trial court. *See Bohus,* 950 F.2d at 930; *Giordano v. McCartney,* 385 F.2d 154, 155 (3d Cir.1967). Even though the trial court has discretion to grant a Rule 60(b)(2) Motion, it is clear that the party seeking relief bears a heavy burden. *See Bohus,* 950 F.2d at 930. Specifically, the moving party must show that the newly discovered evidence is

(1) material and not merely cumulative,
(2) could not have been discovered prior to trial through the exercise of reason-

---

Dr. Eagar looks at articles or something, I invite you to consider the evidence, I know Mr. Raefsky looked at articles also and I think even sent articles to Dr. Eagar and was present when Dr. Eagar did things and you consider all the evidence in the case, and I'm not trying to endorse one witness over the other. N.T. Dec. 6 at 108.

**20.** When the plaintiffs' attorney objected to this instruction, the court instructed the jury that, by referring to Dr. Verzilli's approach, the court had not meant to denigrate the approach taken by the plaintiffs' experts. *See* N.T. Dec. 6 at 107.

**21.** The plaintiffs also claim that they are entitled to a new trial because the court failed to instruct the jury that the plaintiffs did not need to

exclude all other causes of the accident. This objection is unavailing. The court clearly stated that the plaintiffs only needed to prove that the bolt, if defective, was *a* substantial factor in causing the crash. To that end, the court instructed the jury that it

should understand that by a substantial factor we don't mean the only factor or a major factor. An accident can have several causes. As long as plaintiff can prove that one of the causes was hydrogen embrittlement and that the cause was substantial as compared to insubstantial, plaintiff may prevail on Question 2 by getting a yes answer at your hands.

N.T. Dec. 6 at 96–97. This charge clearly informed the jury that the plaintiffs did not need to exclude all other causes of the crash in order to prevail.

able diligence, *and* (3) would probably have changed the outcome of the trial. *Bohus,* 950 F.2d at 930 (citations omitted). *See also Stridiron v. Stridiron,* 698 F.2d 204, 207 (3d Cir.1983); *Giordano,* 385 F.2d at 155; *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 410 (10th Cir.1965), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966).

The plaintiffs contend that the defendants failed to produce certain FAA documents relating to bolt failures prior to trial. In their post-trial memoranda, the defendants argue that they do not retain the records the plaintiffs seek, and could not, therefore, produce them during discovery. The defendants maintain that they provided the plaintiffs with all of the records in their possession. Further, the defendants suggest, the records the plaintiffs seek are beyond the bounds of discovery set by Magistrate Judge Leomporra.[22]

At oral argument the court gave the plaintiffs in excess of fifty days [23] to depose the defendants personnel with regard to these documents. By letter dated February 26, 1992, counsel for the plaintiffs informed the court that it would not proceed with the depositions. Since the plaintiffs have not elected to persist in this objection, the court will treat it as having been withdrawn. For this reason, the court need not reach the issues of whether these documents were merely cumulative, or whether the plaintiffs, through an exercise of reasonable diligence, should have discovered them prior to trial.

## VI. CONCLUSION

For the foregoing reasons, the plaintiff's Motion for post-trial relief will be denied.

---

**22.** Pretrial discovery Motions in this case were referred to Magistrate Judge Leomporra for resolution. After hearing numerous arguments over what records should be produced, Judge Leomporra decided that discovery in this case would be limited to certain bolts which were ·used on certain helicopters. The defendants contend that the documents the plaintiffs claim were withheld relate to other series of bolts and helicopters. Although the issue is not before the court, the court must note in passing both its agreement with the decisions of Judge Leomporra and its thanks to him for his help in resolving these matters.

**23.** The deposition schedule was suggested by counsel for the plaintiffs. *See* N.T. Jan. 27 at 88–89.